**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN A. CONNER DPM, P.C.,** *Individually and on behalf of all others similarly situated.* *Plaintiff* <br><br> **v.** <br><br> **FOX REHABILITATION SERVICES, P.C.,** *Defendant.* | **CIVIL ACTION NO. 21-cv-1580** |

**MEMORANDUM RE: PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BAYLSON, J.                                                                      SEPTEMBER 6, 2022

## I.      INTRODUCTION

Plaintiff Steven A. Conner DPM, P.C. ("Conner"), brings this action against Defendant

Fox Rehabilitation Services, P.C. ("Fox") for alleged violations of the Telephone Consumer

Protection Act ("TCPA") and conversion of Plaintiff's paper and toner used to print "junk" faxes

Plaintiff received.  See generally Class Action Complaint (ECF 1 ("Compl.")).  Presently before

the Court are two motions: Plaintiff's Motion for Class Certification pursuant to FED. R. CIV. P.

23(a) and 23(b)(3)[1] and Defendant's Motion for Summary Judgment.[2]  For the reasons that follow,

Plaintiff's Motion for Class Certification is **DENIED**, and Defendant's Motion for Summary

Judgment is **DENIED**.

---

[1] Motion for Class Certification (ECF 50) ("Class Mot."); see also Defendant Fox's Brief in Opposition to Motion for Class Certification (ECF 54) ("Class Resp."), Plaintiff's Reply Memorandum in Support of its Motion for Class Certification (ECF 57) ("Class Rep."), and Defendant Fox's Sur-Reply in Opposition to Motion for Class Certification (ECF 69) ("Class Sur-Rep.").

[2] Defendant's Motion for Summary Judgment (ECF 63) ("MSJ Mot."); see also Plaintiff's Opposition to Defendant's Motion for Summary Judgment (ECF 72) ("MSJ Resp."), and Defendant's Reply Brief in Support of Summary Judgment (ECF 79) (MSJ Rep.").

II.   **PROCEDURAL HISTORY**

Plaintiff, on behalf of itself and other persons similarly situated, initiated this action on April 2, 2021, alleging Defendant violated the TCPA when it sent Plaintiff a series of fax during the early months of the COVID-19 pandemic and converted Plaintiff's toner and paper used to print those faxes.  See generally Compl. (ECF 1).  On June 10, 2021, Fox answered Plaintiff's Complaint (ECF 7), and the parties proceeded through discovery.

On May 11, 2022, Plaintiff moved to certify A FED. R. CIV. P. 23 class of plaintiffs, including,

> All persons and business entities sent one or more facsimiles on (1) March 27, 2020, (2) April 2, 2020, (3) April 16, 2020, (4) April 21, 2020, (5) May 14, 2020, (6) May 19, 2020, (7) June 3, 2020, or (8) June 16, 2020, identified as 'successful' transmissions on the fax transmission detail reports from OpenFax, and stating [Defendant] was 'HELPING FLATTEN THE CURVE WITH HOUSE CALLS' through its trademarked 'Geriatric House Calls' therapy model,

Class Mot. at 2–3.  The parties completed their briefing, and on August 1, 2022, the Court held a recorded telephonic hearing on Plaintiff's Motion for Class Certification.  Transcript of Class Hearing, Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C., Civ. A. No. 21-1580 (ECF 74).

While Plaintiff's Motion for Class Certification remained pending, Defendant moved for summary judgment on July 6, 2022. See generally MSJ Mot. (ECF 63).  Defendant sought summary judgment on both of Plaintiff's TCPA violation and conversion claims, primarily arguing Defendant's faxes did not qualify as "advertisements" as defined by the TCPA, and thus did not violate the statute.  Id.  The parties completed their briefing, and on August 18, 2022, the Court held a recorded telephonic hearing on Defendant's Motion for Summary Judgment.  Transcript of MSJ Hearing, Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C., Civ. A. No. 21-1580 (ECF 82).

III.   **RELEVANT UNDISPUTED FACTS**[3]

Plaintiff is a private, podiatry practice (Def.'s SUF ¶ 6), and Defendant is a private, healthcare company that provides various forms of physical and occupational therapies to patients in their homes.  Def.'s SUF ¶¶ 1–2.  Patients can connect with Defendant through referrals from their medical providers, like Plaintiff.  Def.'s SUF ¶¶ 7–9, 33.  After a patient's physician refers them to Defendant, the patient or their insurance provider pays for Defendant's services, not the referring physician.  Def.'s SUF ¶ 7.  The parties attribute importance to this fact— that Defendant does not sell its services directly to referring physicians such as Plaintiff (Def.'s SUF ¶¶ 43–44), instead receiving payment for its services from patients or their insurance providers.  Def.'s SUF ¶ 44.

Defendant sent Plaintiff a series of faxes during the early months of the COVID-19 pandemic, approximately from March 2020 through June 2020.  Def.'s SUF ¶¶ 35–39; see also Compl. Exs. A–G.  The content of the faxes is not disputed.  Pl.'s SUF, Exs. A–H.  The first fax dated March 27, 2020 (Compl. Ex. A), acknowledged the unprecedented nature of the COVID-19 pandemic, reiterated Defendant's "top priority" was its patients' "health and well-being," and informed Plaintiff that Defendant's business continued to operate despite COVID-19's interruptions to healthcare.  Def.'s SUF ¶¶ 36, 38.

Thereafter, Defendant sent seven more faxes to Plaintiff (Pl.'s SUF, Ex. B–H), all of which followed a similar formula of content:

(1) first a statement that Defendant was "helping flatten the [COVID-19] curve";

---

[3] Unless otherwise indicated, all facts are derived from Defendant's Statement of Undisputed Facts (ECF 63–2) ("Def.'s SUF") or Plaintiff's related response and counterstatement of undisputed facts (ECF 72–1) ("Pl.'s SUF"), and all are taken in the light most favorable to Plaintiff, the non-movant.  Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

(2) followed by a description of a healthcare issue COVID-19 posed to patients; and

(3) concluding with an anecdote that connected Defendant's services to patients' healthcare issues.  Def.'s SUF ¶¶ 40–42.

For example, Defendant's May 14, 2020 fax stated COVID-19 made "activities of daily living such as self-feeding, toileting, and bathing" more difficult "especially in cases where caregiver assistance is now limited or unavailable."  Def.'s SUF ¶ 42; Compl. Ex. E.  As part of Defendant's campaign to "help flatten the [COVID-19] curve with house calls" the fax described how a Fox occupational therapist educated a patient "on the importance of hygiene as [it] related to infection prevention" and "establish[ed] a new goal for patient[s] to sponge bathe independently, as this method of bathing is safest for patient[s] to perform without assistance."  Def.'s SUF ¶ 42; Compl. Ex. E.

## IV.    CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23

### A.    Legal Standard

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis that the prerequisites of Rule 23 are met."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008).  The party proposing class certification bears the burden of demonstrating all four prerequisites set out in Rule 23(a) and at least one prerequisite contained in Rule 23(b).  Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  Rule 23(a) requires:

(1) numerosity of class members such that joinder of all members is impracticable (numerosity);

(2)  questions of law or fact common to the class (commonality);

(3) the lead representative's claims must be typical of the claims of the entire class (typicality); and

4

(4) the lead representative must fairly and adequately protect the interests of the class (adequacy).  FED. R. CIV. P. 23(a)(1)–(4).

In this case, Plaintiff seeks certification pursuant to Rule 23(b)(3) which requires Plaintiff prove:

(5) class members' "common questions of law or fact . . . predominate over any questions affecting only individual members" (predominance); and

(6) proceeding as a class action [is] the superior method to adjudication (superiority).

FED. R. CIV. P. 23(b)(3); In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184, 190 (3d Cir. 2020).

### 1.   *Ascertainability*

Before those six requirements can be analyzed, though, "an essential prerequisite" to Rule 23(b)(3) certification is class ascertainability.  Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013); Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) ("A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable."); Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013); Marcus v. BMW of North America, 687 F.3d 583, 592–93 (3d Cir. 2012).  To do this, the movant must show: "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  Byrd, 784 F.3d at 163.

Although the movant need not identify every putative class member, the movant does need to prove, "[t]he class is *currently and readily* ascertainable based on objective criteria."  Carrera, 727 F.3d at 306 (quoting Marcus, 687 F.3d at 593) (emphasis added); Hargrove v. Sleepy's LLC, 974 F.3d 467, 469–70 (3d Cir. 2020).  A movant's "assurance to the court that it intends or plans to meet [Rule 23's requirements] is insufficient.  A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful."  Carrera,

727 F.3d at 306; see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154,

192 (3d Cir. 2001) ("[W]here the court finds . . . that there are serious problems *now appearing*,

it should not certify the class merely on the assurance of counsel that some solution will be found.")

(quoting Windham v. Am. Brands, Inc., 565 F.2d 59, 70 (4th Cir. 1977) (emphasis in original)).

**B.    Parties' Contentions[4]**

Plaintiff argues it satisfied the requirements of FED. R. CIV. P. 23(a) and (b) and that

Plaintiff's putative class is defined as,

> All persons and business entities sent one or more facsimiles on (1)
> March 27, 2020, (2) April 2, 2020, (3) April 16, 2020, (4) April 21,
> 2020, (5) May 14, 2020, (6) May 19, 2020, (7) June 3, 2020, or (8)
> June 16, 2020, identified as 'successful' transmissions on the fax
> transmission detail reports from OpenFax, and stating [Defendant]
> was 'HELPING FLATTEN THE CURVE WITH HOUSE CALLS'
> through its trademarked 'Geriatric House Calls' therapy model.

Class Mot. at 2–3.

Defendant argues certification is improper because Plaintiff failed to establish an "essential

prerequisite" to certification—ascertainability of class membership.    Class Resp. at 17–19.

Without an ascertainable class, Defendant argues, Plaintiff subsequently failed to establish Rule

23(a)'s requirements of numerosity (Class Resp. at 32), commonality (Class Resp. at 32–33), and

typicality (Class Resp. at 34).

**C.    Analysis**

Plaintiff failed to satisfy its ascertainability burden because the Openfax transmission logs

Plaintiff relies on to define class membership are demonstrably unreliable.    Even if the logs were

---

[4] The Court considered equally all the parties' arguments in support of and in opposition to class
certification and summary judgment, including those not reiterated in this Memorandum.

reliable, the method Plaintiff sets forth to identify class members requires a highly individualized inquiry not permitted by Rule 23.

        1.     *Ascertainability*

            a.    <u>Plaintiff's Methodology to Ascertain Class Membership is Unreliable</u>

Plaintiff argues Defendant successfully transmitted 144,868 faxes to 20,609 different fax numbers (Class. Mot. at 12), and it is from this list of 20,609 fax numbers that Plaintiff plans to ascertain class membership. <u>See</u> Class Mot. at 2–3, 17 (defining putative class as "persons and business entities" identified as "successful" transmissions on Openfax's transmission log). Plaintiff's methodology is fatally flawed, though, because it relies on documents, the Openfax transmission logs, that are demonstrably unreliable.

In support of ascertainability, Plaintiff provided a declaration of Brett Kokinadis, the President of Openfax.  Class Mot., Ex. A. ("Pl. Kokinadis Dec.") at ¶ 1.  In it, Mr. Kokinadis' explains Openfax is a communication service through which its customers send faxes to lists of fax numbers. Pl. Kokinadis Dec. ¶¶ 3–4.  Openfax labels fax transmissions "successful" by "using an exchange of electronic signals between the sending and receiving [facsimile] equipment."  Pl. Kokinadis Dec. ¶ 5.  Once a transmission is logged "successful," Openfax compiles successful transmissions into lists which it then generates to Openfax customers; Openfax's lists "show[] data as to each fax number to which [a] fax was attempted to be sent, including whether each transmission was successfully sent."  Pl. Kokinadis Dec. ¶ 6.  Therefore, Plaintiff argues class membership can be ascertained by cross-checking Openfax's transmission logs against Defendant's business records.  Class Mot. at 2–3, 17.

However, Defendant's Declaration of Brett Kokinadis to its Response in Opposition to Class Certification reveals the unreliability of Plaintiff's methodology.  Mr. Kokinadis testified,

> ***Just because an Openfax report, like the ones used in this matter, notates the 'status' of a fax transmission is 'successful' does not guarantee that the transmission was actually successfully received*** via print, email, or otherwise, or that it tied up the recipient's fax line.  The only way Openfax would know for sure whether there was truly a successful transmission . . . is by speaking to each intended recipient to confirm the same.

Class Resp., Ex. 1. ("Def. Kokinadis Dec.") ¶ 5 (emphasis added).

Membership in Plaintiff's putative class inextricably relies on Openfax's transmission logs, but because those logs do not actually or reliably reflect whether faxes were successfully transmitted, Plaintiff failed to prove "there is a reliable . . . mechanism for determining whether putative class members fall within the class definition."  Byrd, 784 F.3d 154 at 163; see also Marcus v. BMW of North America, LLC, 687 F.3d 583, 592–93 (3d Cir. 2012) (raising ascertainability concerns because defendant's records could not reliably identify whether potential class members' tires every actually went flat and needed replacement).

When confronted with Defendant's Kokinadis Declaration, Plaintiff offered no alternative methodology to ascertain a class of real persons or business entities that successfully received Defendant's faxes.  See Class Rep. at 17 ("The [Openfax] transmission logs identify each fax number that received each fax . . . . [Defendant] offered nothing that calls the reliability of those transmission logs into question.").  During oral argument, the Court inquired how Plaintiff planned to convert fax numbers on Openfax's lists into real, identifiable, noticeable business entities and individuals.

> COURT: I want to know how you're going to identify the members of the class.  And so far, you've told me it's going to be by a fax number, is that your answer?
>
> MR. OPPENHEIM: It is essentially my answer, yes.
>
> COURT: Well, how do —

> MR. OPPENHEIM: Obviously we can figure out who the holder of any fax number is.
>
> COURT: Well, how do you know who the holder of the fax number is?
>
> MR. OPPENHEIM: There are several means.  First of all, you've got contact data the Defendant has produced, so that's where you'd start.  But you've also got reverse lookup services with lists; you've got, if necessary, subpoenas to phone companies.  ***This would all get sorted out in the notice process***.

Trans. of Class Hrg. at 5:15–6:4.

Plaintiff's response violates the well settled principle that a movant must establish its proposed class is "currently" ascertainable, and assurances that class membership will be defined in the future are insufficient.  See Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 186 n.2 (3d Cir. 2006) (the evolutionary nature of class actions underscores the need for the court's certification order to contain the "full and clear articulation of the litigation's contours at the time of class certification.").  "[W]here the court finds, on the basis of substantial evidence as here, that there are serious problems now appearing, it should not certify the class merely on the assurance of counsel that some solution will be found."  In re Hydrogen Peroxide, 552 F.3d 305, 318 (3d Cir. 2008), as amended (Jan. 16, 2009); see also Carrera, 727 F.3d at 306 ("[A]ssurance to the court that [plaintiff] intends or plans to meet the [ascertainability requirement] is insufficient."); Marcus, 687 F.3d at 591 ("[W]e have repeatedly emphasized that actual, not presumed, conformance with Rule 23 requirements is essential.").

Plaintiff failed to set forth a "reliable mechanism" through which to ascertain membership to its class.  Plaintiff's mechanism—to define membership by the fax numbers in Openfax's "successful" transmission lists—is unreliably because Openfax admits it does not reliably capture fax transmission information.  Plaintiff's contention—it will identify the holders of the fax

numbers on the Openfax lists at a later date—underscores Plaintiff's failure to meet its burden

burden of proving its class is *presently* ascertainable.

> b.   Plaintiff's Methodology to Ascertain Class Membership is Not
> Administratively Feasible

Plaintiff also failed to set forth an administratively feasible way of ascertaining real

members of its class from unreliable lists of fax numbers.  Plaintiff argues Defendant's "records

provide the names and contact information for each doctor on its target list, and the [Openfax]

transmission logs reflect the 'successful' transmission[s]" but Plaintiff provides no explanation for

how it will use those documents to feasibly identify class membership.  At oral argument,

Plaintiff's counsel argued Plaintiff could link fax numbers in Openfax's transmission logs to real

people or businesses with "contact data [] Defendant produced, . . . reverse lookup services with

lists . . .  [and] if necessary, subpoenas to phone companies."  Trans. of Class Hrg. at 5:25–6:3.

Rattling off a list of "means" Plaintiff *could* utilize to identify class membership hardly satisfies

Plaintiff's burden, and Plaintiff has not produced any expert testimony or independent factual data

to support its methodology.  See Carrera v. Bayer Corp., 727 F.3d at 306–07 ("A plaintiff may not

merely propose a method of ascertaining a class without any evidentiary support that the method

will be successful.").  Defendant's Kokinadis' Declaration—which states "the only way Openfax

would know for sure whether" faxes were successfully transmitted "is [to] speak[] to each intended

recipient to confirm the same"—underscores the administrative infeasibility of Plaintiff's

methodology and the additional questions such a method raises such as whether class members

were injured or provided consent. Def. Kokinadis Dec. ¶ 5. Even if the Openfax logs were reliable,

Plaintiff would need to contact at least twenty-thousand fax numbers to see if the people or

businesses connected to those numbers ever received one of Defendant's faxes at issue in this case.

If they did, further inquiry is needed to address issues such as consent and injury.  Indeed, some

of these issues are already presented by recipients of Defendant's faxes who currently meet Plaintiff's class definition but who state they found the faxes *helpful*, not harmful (Class Resp. Ex. 11 ¶ 5, Ex. 12 ¶ 9, Ex. 13 ¶ 5) and consented to receiving them (Class Resp. Ex. 11 ¶ 4, Ex. 12 ¶ 6, Ex. 13 ¶¶ 3–4).

The individualized inquiry Plaintiff's methodology requires is precisely the type of "individualized inquiry into actual injury" that defeats class certification. <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 191 (3d Cir. 2001); <u>see also</u> Carrera, 727 F.3d at 307 ("A plaintiff does not satisfy the ascertainability requirement if individualized fact-finding or mini-trials[5] will be required to prove class membership.  Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.").  Plaintiff's methodology yields only an unreliable list of fax numbers that may or may not possess common issues, and the Court rejects Plaintiff's argument that its list of fax numbers sufficiently satisfies Rule 23's requirements.

> ### 2.   *Predominance*

Defendant also argues Plaintiff's class cannot be certified because individual questions, such as consent and the method of fax receipt, predominate over questions common to the proposed class.  Class Resp. at 19–29.  Consent is a complete defense to TCPA liability, so, Defendant argues, the fact that several fax recipients filed declarations stating they consented to receiving Defendant's faxes, differs those class members' questions of law from Plaintiff's, who contends it

---

[5] Plaintiff argues "thousands of mini-trials" would not be needed if Defendant would produce certain Salesforce records.  Class Rep. at 17.  This argument fails because Plaintiff represented to this Court it never served any discovery request for the Salesforce data is now needs to establish ascertainability.  Class Resp. Ex. 52, Trans. of Motion to Compel Hrg., at 18:10–16, <u>Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C.</u>, Civ. A. No. 21-1580.  ("COURT: Is it correct that you did not have any discovery requests that mentioned Salesforce, and you still haven't served any search terms on [D]efendant, is that correct?  MR. OPPENHEIM: Well, yes.").

never consented to receive Defendant's faxes.  Class Resp. at 20–24.  Plaintiff argues the recipients' declarations cannot defeat predominance because they only establish "consent" not "express consent."  Class Rep. at 5–7.  All the declarations establish, according to Plaintiff, are that the recipients "provided consent for faxes 'like' the ones at issue" but not specifically the faxes at issue in this case.  Class Rep. at 7.

Defendant also argues individual questions, regarding whether class members received the faxes on physical facsimile machines such that they were printed on paper with ink and toner or were received electronically via electronic-mail accounts, also defeat Rule 23(b) predominance.  Class Resp. at 24–25.  Again, Defendant cites to several recipients' declarations which state they did not use traditional facsimile machines subject to the TCPA.  Id. at 25.  Plaintiff counters Defendant's argument—that the TCPA treats traditional fax machines differently than it does faxes transmitted through e-mail platforms— "is wrong."  Class Rep. 13–16.  Even if the Court is persuaded by Defendant's distinction, Plaintiff argues predominance is not defeated because Plaintiff can "identify such recipients [who received faxes via email], [such as by] claim forms at the conclusion of the case."  Class Rep. at 16.

The Court views predominance as another reason Plaintiff's class cannot be certified.  "Predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, a standard 'far more demanding' than the commonality requirement of Rule 23, 'requiring more than a common claim.'"  In re Hydrogen Peroxide, 552 F.3d at 310–11 (internal citations omitted).  Prior, express consent is a complete defense to TCPA liability.  Physicians Healthcare, Inc. v. Cephalon, Inc., 954 F.3d 615, 619 (3d Cir. 2020).  Because Plaintiff contends it never consented to receive Defendant's faxes, but members of Plaintiff's proposed class members declared they *did* consent, individual questions of law predominate over common ones.

Indeed, Plaintiff's argument—that the declarations reveal only "consent," not "express consent" as required by the TCPA—supports this finding because to determine the type of consent each individual class member did or did not provide Defendant, assuming any was given at all, would require individualized review including, but not limited to,

    (i)     whether Defendant sought permission to send these faxes,

    (ii)    what, if anything, Defendant informed each class member about these faxes,

    (iii)   how each class member provided their consent,

    (iv)   whether the specific fax or faxes each class member received fit within the contours of any consent that member may have provided,

    (v)    and whether a class member invited the faxes in some other way than through a request from Defendant to receive them.

Accordingly, Plaintiff's Motion for Class Certification is **DENIED**.

## V.     SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

### A.     Legal Standard

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show [] there is no genuine issue as to any material fact and that that the [movant] is entitled to judgment as a matter of law." Wright v. Corning, 679 F.3d 101, 105 (3d Cir. 2012); FED. R. CIV. P. 56(a).  If a fact "might affect the outcome of the suit under the governing law" then it is "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" when "a reasonable jury could return a verdict for the nonmovant." Id.  The Court should only grant summary judgment if after, "view[ing] the facts in the light most favorable to the nonmovant" (Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997), "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 599 (1986).  The Court must "determine whether there is a genuine issue for trial", not "weigh the evidence and determine the truth of the matter." Peroza-Benitez v. Smith, 994 F.3d 157, 164 (3d. Cir. 2021).

### B.     Parties' Contentions

The parties do not dispute Defendant sent Plaintiff the faxes nor do they dispute their contents.  Defendant argues summary judgment is appropriate because its faxes did not meet the statutory definition of "advertisement." MSJ Mot. at 16–20.  Defendant maintains the faxes were purely informational, "merely inform[ing] physician offices about what [Defendant] was doing to continue providing care safely during the unprecedented COVID-19 crisis."  MSJ Mot. at 16. Plaintiff argues the faxes *were* advertisements because they "drew attention to the availability and

quality of" Defendant's services, and thereby promoted those services Defendant "offers commercially for a profit." MSJ Resp. at 10–11.

    **C.**    <u>**Analysis**</u>

      The TCPA makes it unlawful for any person to "use any telephone facsimile machine . . . to send, to a telephone facsimile machine, an unsolicited advertisement" unless the transmission falls into one of three statutory exceptions. 47 U.S.C. § 227(b)(1)(C). An "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality or any . . . services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 US.C. § 227(a)(5). "Advertising is the action of drawing the public's attention to something to promote its sale" so to be "advertisements," the faxes must have "promote[d] goods or services to bought or sold, and [they] should have profit as an aim." <u>Mauthe v. Nat'l Imaging Assoc., Inc.</u>, 767 Fed. Appx. 246, 248 (3d Cir. 2019) ("<u>NIA</u>").

      Two distinct tests exist to determine whether a fax is an "advertisement": (1) the direct purchaser test (<u>NIA</u>, 767 Fed. Appx. at 249) and (2) the third-party liability test (<u>Mauthe v. Optum Inc.</u>, 925 F.3d 129, 132 (3d Cir. 2019) ("<u>Optum</u>")). The third-party liability test applies when faxes are sent to recipients who are not direct purchasers of the sender's services but "could motivate another party to purchase the sender's goods, products, or services." <u>Mauthe v. Millennium Health LLC</u>, 2020 WL 2793954, at *8 (E.D. Pa. May 2020) (Smith, J.)). The parties do not dispute the third-party liability test applies here.[6] To establish liability under this test, Plaintiff must establish the faxes:

> (1) sought to promote or enhance the quality or quantity of a product or services being sold commercially; (2) was reasonably calculated to increase the profits of the sender; and (3) directly or indirectly

---

[6] Trans. of MSJ Hrg. at 14:11–17, 14:21–15:3.

> encouraged the recipient to influence the purchasing decisions of a
> third party.
>
> It is not enough that the sender sent a fax with a profit motive—in
> order to show that the sender is trying to make a sale, there must be
> a nexus between the fax and the purchasing decisions of an ultimate
> purchaser whether the recipient of the fax or a third party.

Optum, 925 F.3d at 133.

> 1.    *Applying the Third-Party Liability Test*

A genuine issue of material fact exists regarding whether the faxes constituted "advertisements."

Defendant argues the faxes cannot be considered "advertisements" because Defendant did not send them to promote Defendant's services or increase its profits; instead, Defendant argues the faxes were purely informative.  MSJ Mot. at 12–20.  Jason Hazel, the Chief Development Officer at Fox Rehabilitation, testified Defendant sent the faxes to educate referring physicians like Plaintiff about the services Defendant offered during the early months of the COVID-19 pandemic.

> When the idea of this [fax] campaign was discussed and at its origin,
> it was shortly after the start of the COVID-19 pandemic, and as such,
> myself and others within [Defendant] had been informed that
> geriatric patients nationwide, our chosen patient population, were
> failing to receive care that was medically necessary and clinically
> appropriate because clinics were closing and they weren't able to be
> seen, and as such and as providers  of care, we felt the need to
> educate our partners in care, the referring physicians, PAs and nurse
> practitioners that we served their patients for years, that our doors
> were open,  . . . we wanted to provide a landing spot for individuals
> who otherwise would not be accessing care [] they needed . . . [and]
> that [Defendant's] doors were open.

MSJ at Ex. 1, 43:24–44:17.  In conjunction with Mr. Hazel's testimony, Defendant argues the absence of pricing information in the faxes underscores Defendant's stated purpose that they were informational, not promotional.  MSJ Mot. at 18.

Viewing the factual record in the light most favorable to Plaintiff, however, the language within the four corners of the faxes could lead a reasonable factfinder to conclude they *were* promotional and had "profit as an aim." Optum, 925 F.3d at 133.

Defendant's March 27, 2020 fax (Compl. Ex. A) stated:

> [It] is undoubtedly an unprecedented period in the history of the nation" but "the health and well-being of [Defendant's] colleagues, patients, and partners is a top priority to us at our practice.  We wanted to take the opportunity to inform you that [Defendant] as a practice is continuing to move forward treating your older adult patients [and without] 'homebound status or [a] face-to-face requirement in order to start or resume care, [Defendant's] Geriatric House Calls™ therapy model has an important role in controlling the spread of COVID-19.

The content of Defendant's subsequent faxes (Compl. Ex. C–G) was formulaic, containing: (1) a statement that Defendant's "model" supported access to healthcare that would control the spread of COVID-19; (2) an example of a COVID-19 related issue; and (3) an anecdote connecting the COVID-19 related issue to a service Defendant provided to a patient.  For example, Defendant's June 3, 2020 fax (Compl. Ex. G) stated:

- o  Access to healthcare statement: Defendant's "model supports access to care that reduces hospitalization risk, enhances social distancing, and facilitates vital sign monitoring for high-risk patients [and] hygiene education" among other things to control "the spread of COVID-19."

- o  COVID-19 related issue: "Occupational Therapy — Proper Hygiene: Clean and Disinfect.  Provide task and environment modification to promote independence with household management, including routinely disinfecting surfaces with EPA-approved disinfectants."

- o  Anecdote: "[Defendant] occupational therapist observes patient with upper extremity weakness has been wearing soiled clothing.  Patient reports that caregiver

> who assisted with laundry is ill and no longer able to assist. [Defendant] occupational therapist develops and trains on home exercise program targeting bilateral bicep strength to improve patient ability to transport laundry basket."

Although, "a fax does not become an advertisement merely because the sender intended it to enhance the quality of its [] services and thus its profits" (Optum, 925 F.3d at 133) a reasonable factfinder could conclude the language in these seven faxes promoted the availability and quality of Defendant's services such that they could be advertisements.

The specific language in Defendant's faxes distinguishes them from others analyzed by courts in this circuit. In Optum, a company maintained a national database of healthcare provider information and it sold that information to various healthcare, insurance, and pharmaceutical companies. Optum, 925 F.3d at 131. The database company sent unsolicited faxes requesting the provider recipient verify certain demographic data. Id. at 132. The provider argued the faxes were advertisements because they sought to improve the sender's database, and thus increase the company's profits (id. at 134) but the Court rejected this argument, holding the faxes did not "encourage [plaintiff] to influence the purchasing decisions . . . of a third-party." Id. at 135.

The Optum faxes were sent to improve the accuracy of the sender's database, but the faxes here were sent to remind Plaintiff that Defendant's services were available, Defendant's business operating without limitation despite increasing COVID-19 regulations, and Defendant's services could be administered to patients without "face-to-face" or "homebound" prerequisites. Also unlike the Optum faxes, these faxes contained language warranting the quality of Defendant's services; they identified a patient problem, identified a service Defendant offered (at cost), and then explained how Defendant's service sufficiently fixed the patient's problem. A reasonable factfinder could conclude this language "promote[d] . . . services to be bought or sold" and had

"profit as an aim" particularly in light of the undisputed fact Defendant's business model, even before COVID-19, was to charge a fee in exchange for resolving a patient's healthcare problem they experienced at home.  Def.'s SUF ¶ 7.

**VI.**    **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff's Motion for Class Certification is **DENIED**, and Defendant's Motion for Summary Judgment is **DENIED**.  An appropriate Order follows.


O:\CIVIL 21\21-1580 Conner v. Fox Rehabilitation\21cv1580 Memo re Class Cert and MSJ.docx