**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN A. CONNER DPM, P.C.,**<br>*Plaintiff*,<br><br>**v.**<br><br>**FOX REHABILITATION SERVICES, P.C.,**<br>*Defendant*. | **Civil Action No. 2:21-cv-1580-MMB** |

<u>**MEMORANDUM OF DECISION AND APPENDICES**</u>

BAYLSON, J.                                                                          **February 24, 2023**

I.        <u>**INTRODUCTION**</u>

     A three-day non-jury trial was held before the Court in January 2023 on claims brought by Plaintiff Dr. Steven Conner against Defendant Fox Rehabilitation Services.  At issue was whether eight faxes that Dr. Conner's practice received from Fox during the early days of the COVID-19 pandemic in 2020 were illegal junk faxes under the federal Telecommunications and Consumer Protection Act of 1991.  Over the course of the trial, the Court heard testimony from several fact witnesses including the Plaintiff, three representatives of the Defendant, and two office managers unrelated to the Plaintiff who testified to having also received the faxes and who were putative class members before the Court denied class certification in September 2022. Because Fox had stipulated to having sent the eight faxes, the primary issue at trial was whether Fox's faxes constituted "unsolicited advertisements," a necessary requirement for liability under the statute.

     The Court had and currently has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and over the state law conversion

claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), given the state law claims arise from the same set of facts as the federal claims.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

At the conclusion of the trial, the Court found that Dr. Conner (the only witness called for Plaintiff's case) and the Fox witnesses were credible in their testimony. These witnesses did not contradict each other as to the facts underlying the legal issues in dispute. The Court adopts Fox's facts as stated in Fox's post-trial briefing, but recounts below the facts significant for this memorandum of decision. See Defendant Fox Rehabilitation's Post-Trial Brief at 2-4 ("Def's Br.") (ECF 150).

Plaintiff Dr. Steven Conner is a podiatrist based in Pittsburgh, Pennsylvania. Dr. Conner uses a Xerox-brand fax machine at his practice for treating patients, primarily as a communication destination for incoming lab results.

Defendant Fox Rehab is a New Jersey-based business that offers a variety of physical, occupational and speech therapy services in the form of house-calls to patients throughout the country. One way that Fox receives patients is through referrals from doctors.

On March 27, 2020, Fox Rehab sent a fax message to Dr. Conner's fax number, which was included on a list of fax numbers kept on Fox Rehab's personal electronic database. See Stipulated Facts at 1 (ECF 132). Fox Rehab sent seven other fax messages to the same list, using a third-party fax service called OpenFax, spread out between April 2020 and June 2020. Dr. Conner received all seven of the additional Fox faxes. Id. The Court will go into more detail below on the contents of each fax. The faxes addressed Fox's acknowledgment of the pandemic,

each containing the headline "Helping Flatten The Curve With House Calls."  Dr. Conner testified that prior to receiving the eight faxes, he had had no contact whatsoever with anyone from Fox Rehab and had never referred a patient to Fox.  Above all, Dr. Conner stated his annoyance with the faxes because reviewing and sorting them took time away from reviewing pertinent, patient-related faxes.

Fox Rehab's defense for sending the eight faxes to Dr. Conner, as stated by several witnesses during the trial, the pandemic had thrown the country's healthcare system into a confused disarray.  To reassure its partners and providers that Fox was open for business and its services could be counted on, Fox's management team developed a plan to send fax messages to referring physicians who had a shared patient with Fox within the last three years.  Fox represented that a fax is still a common way physicians communicate with referrals.  Responsible for the fax campaign was Fox's chief development officer, Jason Hazel.  Hazel consulted with an internal "COVID task force" at Fox to come up with fax messages that would "get the word out" to physicians and nurse practitioners who "send patients our way" for treatment.  Hazel also met with members of Fox's sales team who helped extract the roughly 20,000 fax numbers that fit the plan from Fox's electronic records database.  Hazel testified that the only way a number got on that final list was if that physician was someone "we shared patients with."

Fox did not just come up with the fax idea out of the blue.  Matthew Blye, a Fox executive salesperson, testified that in the early days of the pandemic, many of Fox's referral sources had reached out to Fox asking for information related to Fox's position given the pandemic.  Blye testified that Fox was primarily seeking to inform providers that Fox was adhering to the COVID guidelines for healthcare that were being promulgated at the time.  In Blye's words, this was Fox's first ever attempt at a 'blast fax' campaign.

3

Fox hired a third-party business called OpenFax that sent the actual faxes to recipients. Fox's technology director Michael Sokorai testified that the costs of the fax campaign ultimately came out of Fox's informational technology budget because of its internal status as an information communication.

Out of the roughly 20,000 recipients of the faxes, less than thirty requested Fox to stop sending such faxes. Others found the faxes helpful: two healthcare office managers testified that they had received Fox's faxes and found them to be very helpful in assuring their own practices that Fox remained open for business, was comporting with COVID protocols and was "taking steps to bring additional services to my attention." They also testified that they did not see the faxes as advertisements because the faxes "weren't trying to sell me something" and they "state things helpful to my practice."

### III.   PROCEDURAL HISTORY

Dr. Conner filed this lawsuit as a class action on April 2, 2021; Fox filed its answer on July 10, 2021. On May 11, 2022, Conner filed a motion to certify a class. Fox followed by filing a motion for summary judgment on July 6, 2022.

On September 6, 2022, the Court denied class certification and Fox's motion for summary judgment. See Steven A. Conner DPM, P.C. v. Fox Rehabilitation Servs., P.C., No. 21-1580, 2022 WL 4080761 (E.D. Pa. Sept. 6, 2022). Regarding class certification, the Court found that Conner could not sufficiently establish ascertainability because OpenFax's fax transmission lists "do[] not reliably capture fax transmission information," resulting in the class's failure to be currently ascertainable. Id. at *4-5. The Court also found that Conner's class lacked predominance because it was an open question as to whether members of the putative class had consented to receiving faxes from Fox, which would serve as a complete defense to

TCPA liability.  Id. at *6.  As for Fox's summary judgment motion, the Court denied the motion because "the language within the four corners of the faxes could lead a reasonable factfinder to conclude they _were_ promotional."  Id. at *8.  Conner sought an interlocutory appeal on the Court's decision regarding certification, which was denied by the Third Circuit.  See Order (Doc. 15), Steven A. Conner, DPM, P.C. v. Fox Rehabilitation Servs., P.C., No. 22-8048 (3d Cir. Dec. 5, 2022).

On October 19, 2022, the Court set a non-jury trial date for January 23, 2023.  On November 29, 2022, Conner filed its own motion for summary judgment.  On January 18, 2023, he Court held a telephonic final pretrial conference with the parties during which the Court denied Conner's summary judgment motion without a memorandum decision given the clear existence of genuine disputes of material fact.  See 1/18/23 Transcript of Final Pretrial Conference at 8 (ECF 143); see also Pretrial Order at 1 (ECF 135).

## IV.  **DISCUSSION**

The Court must decide—for each of the eight faxes that Fox has stipulated to having sent to Dr. Conner and which Dr. Conner credibly testified he received on his fax machine at his practice—whether the fax "advertis[es] the commercial availability or quality of any property, goods, or services."  If the fax fits this definition, which is the TCPA's definition of an advertisement subject to liability, the Court must then decide whether a statutory exception applies, such as the established business relationship exception, or a rule of reason exception. The Court must also decide whether the First Amendment protects Fox from liability.  If no exception or protection applies, the Court must then decide whether Fox "willfully or knowingly" sent unsolicited advertisements to Dr. Conner, which would give the Court

discretion to award treble damages.  Finally, the Court must dispose of Dr. Conner's state law claims for common law conversion.

### A.  Did the Faxes Violate the TCPA?

The relevant part of the Telecommunication Consumer Protection Act provides: "It shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(c).  The statute defines an "unsolicited advertisement" as being "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise."  47 U.S.C. § 227(a)(5).  The statute imposes a penalty of "actual monetary damages" or $500 per violation, whichever is greater.  47 U.S.C. § 227(b)(3)(B).

At trial, Dr. Conner credibly testified that he did not give permission to Fox to send the faxes. Fox does not deny that it sent the faxes using a "telephone facsimile machine" or that Dr. Conner did not receive the faxes on a "telephone facsimile machine."  Therefore, the only element in dispute is whether the faxes constitute "advertisements" under the TCPA.

Dr. Conner argues that the faxes are clear advertisements because they promote the quality and availability of Fox Rehab's therapy services, not just that Fox is remaining open despite the pandemic.  See Plaintiff's Post-Trial Brief at 2 ("Plf. Br.") (ECF 151).  Specifically, Dr. Conner characterizes the faxes as advertising Fox's adoption of new techniques in order to deal with healthcare challenges due to COVID as well as the continued promotion of the advantages of Fox's trademarked therapy model.  Id.

Fox argues that the faxes contain no commercial promotion but are instead merely informational, intended to assure providers that amid the confusion of the pandemic, patients can continue to rely on Fox for services that comport with the need to prevent the infection and spread of COVID.  See Def. Br. at 3-4.  Fox also asserts that the Court is required to consider the context of the pandemic in its decision on whether the faxes are advertisements.  Id. at 6.

The Court must adhere to the guidance provided by the Third Circuit on how courts should go about determining whether a fax is an advertisement.  Liability must be based on an objective standard—neither the intentions of the sender nor the opinions of the recipient factor into the equation.  See Robert W. Mauthe MD PC v. Millenium LLC, 58 F.4th 93, 96 (3d Cir. 2023) ("[T]he term 'unsolicited advertisement' does not depend on the subjective viewpoints of either the fax sender or recipient, and thus an objective standard governs whether a fax constitutes an unsolicited advertisement.").  Other than this golden rule, the Third Circuit has stated that courts can spot illegal junk faxes by considering if the advertisement has "profit as an aim," if it promotes a discount or price, if it comes with a sales contact, or if it contains "testimonials, product images, or coupons."  Id.; Robert Mauthe M.D., P.C. v. Optum, Inc., 925 F.3d 125, 133 (3d Cir. 2019) (fax asking recipients to update their information 'on file' was not an advertisement).[1]  These distinctions are crucial, the Third Circuit states, since not all faxes "are sent for a commercial purpose."  Millenium, 58 F.4th at 96.

---

[1] It is true that the services which Fox Rehab is alleged to have advertised cannot be directly purchased by Dr. Conner.  Fox's physical therapy services benefit patients, who pay for the services via insurance claims.  Dr. Conner and other providers only 'refer' patients to Fox, although ostensibly the providers benefit from a successful referral when those patients return to them for medical care and further referrals.  Neither party argues otherwise, but the Third Circuit has found that junk fax liability can apply under this arrangement, unique to the healthcare industry.  See Optum, 925 F.3d at 133 (providing an example of "third-party based liability" under the junk fax statute where "a fax [is] sent to a doctor encouraging the doctor to prescribe a particular drug to the doctor's patients who, rather than the doctor, are the likely purchasers of the sender's product") (citing to Mauthe v. Nat'l Imaging Assocs., Inc., 767 Fed.Appx. 246, 249-50 (3d Cir. 2019) (non-precedential)(satisfaction survey fax was not an advertisement)).

The FCC has also promulgated guidance on this issue by defining non-offensive fax messages that contain only "information" as opposed to commercial promotion: "By contrast, facsimile communications that contain only information, such as industry news articles, legislative updates, or employee benefit information, would not be prohibited by the TCPA rules." <u>Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005</u>, 71 Fed. Reg. 25967, 25973 (May 3, 2006).

Admittedly, it is not much to go on, and so it is up to the district courts to make their best judgment as to whether a fax, looking "objectively," is an advertisement or merely an "informative" message.

### B.  The "Reasonable Recipient"

In the recent ruling <u>Robert W. Mauthe MD PC v. Millenium Health LLC</u>, a junk fax advertisement case involving notifications regarding a free educational seminar on chronic pain treatment, the Third Circuit made the following holding: "Here, under an objective standard, **no reasonable recipient** of Millennium Health's unsolicited free-seminar fax could view it as promoting the purchase or sale of goods, services, or property." <u>Millenium</u>, 58 F.4th at 96 (emphasis added).  Fox has affixed the bulk of its legal defense to this single line since the precedential opinion was recently ruled as of January 19, 2023.  Fox asserts that the line from <u>Millenium</u> establishes an exception to the golden rule that a court's analysis of whether a fax is an advertisement must be objective, or that at least there is additional context to be added to the analysis.  Fox argues that <u>Millenium</u> constitutes additional guidance for courts' junk fax analysis under the TCPA, asking courts to incorporate into their consideration whether a "reasonable recipient" would think the fax is an advertisement.  Naturally, Fox argues that the Court should take into account how doctors' offices would have viewed the faxes in the context of the

confusion resulting from the COVID pandemic' onset in spring and summer 2020 when the faxes were sent.

Fox argues that taking into account the additional guidance from Millenium, a "reasonable recipient" would not have thought that the faxes promoted the availability of Fox's outpatient physical therapy services with the primary goal of gaining more referrals (and the revenue from those referrals), but that Fox was merely informing providers of the additional measures it was adapting into its services to prevent patients from contracting or spreading the COVID virus.

In response, Dr. Conner has taken a stern stance against Fox's characterization of the Millenium holding, arguing that the TCPA must be read "plainly" and that Millenium's reference to a "reasonable recipient" is nothing more than affirmation of the objective standard rule.  In other words, we should not take into account the confusion among health providers, the need to "flatten the curve," or that the nationwide pandemic even occurred in determining if the faxes are advertisements.  Because the "reasonable recipient" language was included in binding precedent relevant to this case, the Court analyzes its consequence below.

The "reasonable person" standard is a legal creation that courts have used to frame the standard of conduct by which parties must comport to remain out of reach of liability.  See e.g., Miller v. Philadelphia Geriatric Ctr., 463 F.3d 266, 273 (3d. Cir. 2006) (applying a reasonable person standard to the application of the discovery rule); Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887-88 (1984) (applying "an objective" reasonable person standard to constructive discharge analysis in employment discrimination).  The Third Circuit has classified the reasonable person standard as "objective."   See e.g., Wiest v. Lynch, 710 F.3d 121, 132 (3d Cir. 2013) (using the "reasonable person" standard to define an "objectively reasonable" belief in the

context of private causes of action under the Sarbane-Oxley Act); United States v. Kosma, 951 F.2d 549, 551 (3d Cir. 1991) (finding the same in the context of whether defendant violated "threats against the president" statute); Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1231 (3d Cir. 1988) (contrasting a "subjective" legal standard with "the objective, or reasonable person" standard in the employment discrimination context).

To the Court's knowledge and research, the "reasonable person" standard is not mentioned in the TCPA's legislative history. The Millenium decision did not provide further analysis on the term "reasonable recipient" and the parties do not cite to precedential opinions bearing on the facts of this case that mention the standard. Instead, both sides cite to principles of statutory interpretation in support of their respective arguments. Fox cites favorably to the 'rule of reason' framework used primarily in antitrust law, an approach standing for a court's ability to apply a "reasonable" interpretation of the plain terms of a statute. Plaintiff in contrast argues that courts should not be allowed to augment the plain terms of the statute, especially where the statute itself provides its own definition of the term.

Elsewhere, the Third Circuit does prescribe a "reasonable consumer" standard for evaluating liability for false advertising under the Lanham Act. 15 U.S.C. § 1125(a); Pernod Ricard UAS, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241 (3d Cir. 2011). In the Lanham Act context, as here, the term "reasonable consumer" is not in the governing statute. However, federal courts have adopted a standard by which a plaintiff can establish Lanham Act liability by showing the alleged false advertisement would "mislead a reasonable consumer." An example may be whether a liquor product is truly manufactured in Cuba because it is called "Havana Club" rum. Pernod Ricard, 653 F.3d at 248-49. A condition for determining whether a reasonable consumer could be misled by an advertisement is that the court must "not consider

th[e] words in isolation"—the court must consider the alleged false statement in "the context of the entire accused advertisement."  Id 252-53.  Another wrinkle in Lanham Act cases is the widespread use of "survey evidence" to support or refute what a reasonable consumer might think about an advert, and courts must exhibit "thoughtful reflection on potential ambiguities in an advertisement, which can be revealed by surveys and will certainly be pointed out by plaintiffs, will regularly make it the wisest course to consider survey evidence."  Id at 253-54.

While it may appear that the Third Circuit's Lanham Act jurisprudence might support Fox's argument for considering additional context in assessing liability under consumer advertising laws, the Court will not adopt such an analysis for TCPA liability in the absence of an explicit holding from the Third Circuit.  The Court's interpretation of Millenium is that the objective approach remains intact and that the "reasonable recipient" standard considers only that material contained within the four-corners of the fax.  Even within the context of COVID, courts can take an objective approach to their TCPA analysis limited to the four corners of the fax.  This interpretation is consistent with the "reasonable recipient" language from Millenium and does not require the crafting of an entirely new paradigm where courts have to consider the specifics of *who the fax recipient is*.  Nothing in Millenium suggests that the Third Circuit intended anything of the kind—the Millenium court's analysis started and ended with the four corners of the fax.  "We realize that a recipient may regard a fax soliciting participation in an unpaid market survey to be no less intrusive or annoying than a fax that offers to pay the recipient for participating in the survey. But . . . 'we are constrained in reaching our decision by what the TCPA actually prohibits—it does not prohibit all unsolicited faxes, just advertisements.'" [2]  Fischbein v. Olson Research Group, Inc., 959 F.3d 559, 564 (3d Cir. 2020)

---

[2] In Fischbein, the Third Circuit held that a marketing survey fax was an illegal advertisement because the fax included "[a]n offer of payment in exchange for participation in [the] market survey."  Fischbein, 959 F.3d at 564.

(quoting Optum, 925 F.3d at 135).  At most, the Court may be able to consider the faxes in the context of the series, as opposed to each as an isolated communication, which is also consistent with the Lanham Act standard and still adheres to objective standard solidified in Third Circuit precedent.  However, such a consideration has no bearing on the facts presented here.

## C.  **The Eight Faxes**

Given the outline of the law above and having addressed the "reasonable recipient" language from Millenium, the Court now turns to the main question at hand: are Fox's faxes in fact advertisements?

Fox argues that its faxes all contain information, not advertisements, based on the need to "get the word out" to providers that, during a time where the national healthcare as we knew it was cast into disarray, Fox was open for business and had adapted its services to the challenges of the pandemic.  However, it is clear that all eight faxes are promoting Fox's services in a way that suggests more so Fox is trying to secure referrals from providers.  The faxes tout a specific "model" of care used by Fox and which Fox describes as high quality and unique.  While the faxes certainly describe capabilities of Fox's services as they pertain to dealing with the challenges of COVID, that is still a promotion of quality and not solely and informational exercise.  The Court addresses each Fox fax in turn below.[3]

### 1.  **Fax #1**

Fax #1 comes closest to the "informational" fax that Fox argues for.  It is a long, letter-style message recognizing the pandemic and its effects on the healthcare industry, while seeking

---

While the court opined that "healthcare professionals [are] especially vulnerable to unsolicited faxes" because, for the most part, they are the only demographic that "still rel[ies] on faxes for certain communications," the court's consideration of the "recipient" in that case did not have a bearing on whether the fax was an advertisement.  See id. ("[O]ur opinion must be cabined.").

[3] The eight Fox faxes have been attached to this memorandum as Appendix A.

to assure recipients that Fox is still open for business and committed to its patients.  But while the majority of the fax message appears to be on the informational side, it still promotes qualities of Fox's proprietary "house call" model, trademarked and therefore presumably proprietary of Fox.  The bullet points describe the quality of Fox's services—even though these descriptions are within the context of dealing with the challenges of the pandemic, they are still promoting the commercial quality of the services offered.  Here—and with the other seven faxes—there is an embedded profit motive to gain referrals from past providers, because the more referrals Fox receives the more revenue they are hoping to receive from the patients' insurance.  Therefore, Fax #1 is an advertisement.

### 2. Fax #2

Fax #2, and the other seven after it, are much more easily identified as advertisements. While the pandemic is the subject of the fax given the header, the substance of the fax promotes the proprietary "Fox Model" for treatment of patients and how that model "reduces hospitalization risk, enhances social distancing, and facilitates" several other qualities of service. Simply put, by describing the level of quality of the services being provided through words like "reduces" and "enhances," the fax goes further than just informing the recipient that is open for business or even that Fox is adhering to COVID-preventive protocols.  Fox's phone number and website are also provided.  For these reasons, Fax #2 is an advertisement under the TCPA.

### 3. Fax #3

As the fax before it, Fax #3 describes the level of quality of Fox's proprietary services. By stating that Fox's "Geriatric House Calls™" model, as opposed to any, non-specific category of treatment services that can be offered by any variety of clinical providers like Fox, "plays an important role in controlling the spread of COVID-19," the fax makes an important distinction

13

between its services and other comparable services while highlighting the quality of its own.  Cf. Millenium, 58 F.4th at 95 (presentation from educational seminar fax did not indicate what companies manufactured the drug tests explained in the seminar).  The Court acknowledges that the analysis may have concluded differently if Fox had described the general "importance" of home therapy services that enhance social distancing, as opposed to describing only Fox's own proprietary treatment.

Fax #3 is the first of the eight faxes to contain a section in the middle of the fax that hits the borderline between informational and commercial substance; where the fax discusses and shares anecdotes on challenges to managing medication compliancy given the pandemic.  But because the fax promotes the quality of Fox's services near the top of the fax, Fax #3 is an advertisement.

### 4.  Fax #4

Fax #4 contains nearly identical substance to Fax #3, except that where Fax #3 contains a section on medication compliancy, Fax #4 contains a section on coping with anxiety due to the pandemic.  For the same reasons, however, Fax #4 is an advertisement.

### 5.  Fax #5

Fax #5 follows the same format as Faxes #3 and #4 but contains a section on occupational therapy and safety.  Fax #5 also contains an option to unsubscribe from "future communications like this," as do the following three Fox faxes.  For the same reasons as above, Fax #5 is an advertisement.

### 6.  Fax #6

For the same reasons as above, Fax #6 is an advertisement.  The Court notes that the middle section of Fax #6, which addresses "Cognition and Safety At Home," contains

educational material and recites an anecdote without mentioning Fox's proprietary services. This section does not promote commercial quality or availability. If the fax merely consisted of that section alone, it would not be an advertisement.

### 7. Fax #7

For the same reasons as above, Fax #7 is an advertisement.

### 8. Fax #8

For the same reasons as above, Fax #8 is an advertisement.

* * *

Fox still argues that because the faxes do not seek to "make a sale" but merely inform providers that Fox is safe for patients given the drastic healthcare challenges posed by the pandemic, they are not "advertisements." This could be a compelling argument given the confusion during the early days of COVID, but Fox's argument —that "healthcare notifications" cannot constitute commercial promotions under the TCPA—does not hold water. The clear problem is the intersection with ads, business and health/safety. Faxes to providers "notifying them" that Fox is capable of helping their patients can be considered a safety bulletin, because it concerns the health of patients. If Fox had a cure to Alzheimer's, letting its referral sources know this may be an essential important duty to providing care to individuals.

At its core, Fox's argument seeks to treat certain types of commercial advertising— promotion of new capabilities within services offered—as informational. An informational fax regarding COVID may announce a business's general adherence to new government regulations. But if Fox is allowed to "inform" providers for every new service offered merely because there is a "health and safety" component, the floodgates open for the whole industry to send unsolicited

faxes for every new medication or service that they offer.  Fox calls its faxes "critical, time-sensitive healthcare information"—this cannot be so.

Under the statute, should companies be able to alert, through unsolicited faxes, the people who will facilitate the purchase of its products to the new safety features of its products or services?  Because the new safety features of a product or service constitutes a "quality" of the product or service, such a fax should be considered an advertisement under the TCPA.

### D.  <u>If the faxes violated the TCPA, do they fall under any exceptions to liability?</u>

Fox appeared to suggest through its questioning of Dr. Conner at trial that a pre-existing business relationship existed between Fox and Conner prior to the sending of the faxes.  On cross-examination, Fox's lawyers mainly attempted to establish that Dr. Conner had a previously established connection with Fox Rehab before receiving the pandemic faxes.  The defense presented a medical record from patient W.N. showing that W.N.'s physician was Dr. Conner and that W.N. had been treated multiple times by Fox before the pandemic.  However, while Dr. Conner admitted to having performed surgery on W.N., he denied ever having personally prescribed treatment at Fox for W.N.  Later on, Jason Hazel, Fox's CDO, testified that while Dr. Conner appeared to be W.N.'s referring physician according to the medical record, the record itself was received by Fox from one of its subcontractor therapy sites, a home health agency called Butler.  To Hazel, while the medical record indicated that Dr. Conner (or someone at Dr. Conner's practice) referred W.N. to Butler for physical therapy and not Fox, W.N. was still a "shared patient" because Butler was subcontracted by Fox to provide W.N.'s therapy—"an indirect referral."  Matthew Blye also offered testimony on this subject, testifiying that the W.N. record indicates Fox shared a patient with Dr. Conner.

However, Fox does not argue now that the established business relationship exception applies, nor would it, since four of the faxes do not have an opt-out provision as required for the exception to apply.  The facts upon which such an exception may rely—a third-party contractor's having possibly treated one of Dr. Conner's patients—do not establish a direct, two-way relationship also required for the exception.  See 47 U.S.C. § 227(b)(1)(C)(i); 47 U.S.C. § 227(b)(2)(D)(ii); Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC, 950 F.3d 959, 967 (7th Cir. 2020) ("[I]t would seem odd if a company could solicit express prior permission to send fax advertisements, then transfer that permission to a completely different company who in turn may send advertisements with impunity until the consumer affirmatively terminates its previous permission.").

Fox does argue that the TCPA is unconstitutional under the First Amendment because its prohibition is "overly broad" and sweeps in "non-commercial speech."  Def. Br. at 14-15. Plaintiffs argue that even if Fox's argument is persuasive, it didn't file a notice of constitutional defense under Rule 5.1.  Plf. Br. at 12.  Neither side cites to Third Circuit precedent—one district court decision has held the TCPA junk fax provisions constitutional.  Robert W. Mauthe, M.D., P.C. v. MCMC LLC, 387 F.Supp.3d 551 (E.D. Pa. 2019) (Smith, J.).  Because the Court finds the well-reasoned opinion of Judge Smith persuasive on this issue, the Court rejects Fox's First Amendment argument and finds that the TCPA's junk fax prohibitions is constitutional.

**E.  If the faxes violated the TCPA, is Conner entitled to treble damages?**

Under the TCPA, "[i]f the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than [$1500]."  47 U.S.C. § 227(b)(3).

Unlike the liability determination, it is necessary to take a subjective approach to whether treble damages should be awarded, since the defendant must have acted willful or knowing to trigger the additional penalty.  Testimony elicited from Mssrs. Hazel, Blye and Sokorai showed that Fox's employees charged with leading the fax campaign were at least somewhat knowledgeable of the TCPA's junk fax prohibition.  It was also elicited that some of the recipients of the faxes had contacted Fox and asked them to cease transmitting them; one even accused Fox of violating the TCPA with the faxes.  Mr. Sokorai also signed a form for OpenFax stating that he was aware of the junk fax provision in the TCPA.  Finally, Conner's lawyers elicited testimony apparently establishing that Fox included an opt-out feature on its final four faxes at the advice of counsel.

Fox's inclusion of an opt-out feature in the last four faxes, a necessity to escape liability under established business relationship exception, would tend to be conspicuous where the asserted reasons for the faxes was to make medically necessary alerts and not ads.  But the Court should not penalize a defendant for trying to protect itself on advice of counsel, even if it goes to willfulness.

On the facts as elicited at trial, the Court finds that Conner has not established that Fox acted willfully or knowingly, and that Fox's witnesses were credible when they testified that their intent was to inform their past referral providers of their additional COVID capabilities, not to gain referrals in spite of TCPA restrictions.

**F.   Is Conner entitled to damages on his conversion claim?**

In addition to his federal claims, Dr. Conner brings claims of conversion related to the Fox faxes, which he claims took up his time, his ink, and tied up his fax machine lines.

"Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay to other the full value of the chattel."  Restatement (Second) of Torts § 222A(1) (1965). Pennsylvania courts have followed the Restatement (Second) of Torts when analyzing claims for conversion.  See, e.g., Norriton E. Realty Corp. v. Cent.-Penn Nat'l Bank, 435 Pa. 57, 254 A.2d 637, 638 (Pa.1969); Northcraft v. Edward C. Michener Assocs., Inc., 319 Pa.Super. 432, 466 A.2d 620, 624 (Pa.Super.Ct.1983).

Conversion requires "serious interference with the owner's right to the property in question, not serious consequences (i.e., a substantial monetary loss) as a result of that interference." Bell v. Money Resource Corp., No. 08-639, 2009 WL 382478, at *4 (E.D. Pa. Feb. 13, 2009) (Kauffman, J.).  Pennsylvania law permits conversion claims for only nominal damages.  Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 727 (Pa. 1964) ("Nominal damages represent the award of a trifling sum where there has been a breach of duty or infraction or invasion of a right, but no real substantial or serious loss or injury has been established.").

Although the facts show that Fox sent junk faxes to Dr. Conner's fax machine, the Court cannot find that this was "serious" interference and thus rules for Fox on the conversion claims.

## V.   **CONCLUSION**

Based on the findings of facts and reasoning above, the Court finds for the Plaintiff Dr. Steven Conner on its TCPA claims only.  An appropriate order follows.

**APPENDIX A**

 Scans of each of the eight Fox Faxes as admitted by the Court at the January 2023 bench trial has been attached to this appendix below, with Dr. Conner's fax number redacted:

**Fax #1 (PX001)**



27-Mar-2020  15:42    UTC    To:                              FOX Rehab          p.1

- PX001 -

# FŌX

## [ FOX RESPONDS: HELPING FLATTEN THE CURVE WITH HOUSE CALLS ]

This is undoubtedly an unprecedented period in the history of the nation, and certainly for all of us within the healthcare arena as we face the threat of coronavirus (COVID-19). As always, the health and well-being of our colleagues, patients, and partners is a top priority to all of us at our practice. We wanted to take the opportunity to inform you that FOX Rehabilitation as a practice is continuing to move forward treating your older adult patients; and as of today, the CDC recognizes physical, occupational, and speech therapists as essential medical services that should in fact continue at this delicate time. Please feel free to share this update with your colleagues and community.

Public health experts urge Americans to stay away from one another, which could lead to social isolation, already a problem in our older adult population. Social distancing is the necessary recommendation to combat COVID-19, yet undoubtedly will have unfavorable effects on access to care and management of chronic conditions, along with overall quality of life.

*With no homebound status or face-to-face requirement in order to start or resume care,* FOX's Geriatric House Calls™ therapy model has an important role in controlling the spread of COVID-19 as well as assuring adverse outcomes to our older patients are minimized:

- FOX physical, occupational, and speech therapists can prescribe skilled interventions within the home, supporting both the acute and chronic population with the highest need, preventing unnecessary appointments, emergency department visits, and hospitalizations.

- It is within the scope of practice for FOX clinicians to manage and monitor vitals and symptoms, based on the guidelines of the CDC and Federal Government.

- Recommendations on alterations, adjustments, or additions to the home environment that affect the layout and structure of the home, all while increasing safety—adequate food, paper goods, medical supplies, medication compliance, etc.

- Multidisciplinary, home-based therapy approach is effective in the identification of an older adult's patterns of daily living, caregiver specific needs, interests, and values to determine the necessary interventions in order to remain active and involved.

- FOX clinicians are continually informed of all CDC and Federal recommendations and procedures, including universal precautions to prevent virus transmission—we are vigilantly following these protocols.

The situation across the nation is constantly evolving, future communications will as well. Thank you for your continued confidence in FOX in assisting in the care for your older adult population, especially under these critical conditions. *Let's continue to stand together as a community to support and uplift one another.*

**FOR MORE INFORMATION CONTACT FOX REHABILITATION AT 1.877.407.3422.**

FOXREHAB.ORG      TM FOX, PT, DPT, GCS-Emeritus, CCI   |   LIC #40QA00702150   |   7 Carnegie Plaza, Cherry Hill, NJ 08003   |   2020-0134-08

**Fax #2 (PX002)**

2-Apr-2020  17:25   UTC   To: ▮▮▮▮▮▮            FOX REHAB          p.1



# FOX RESPONDS TO COVID-19

·····································································

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

**THE FOX MODEL SUPPORTS ACCESS TO CARE THAT REDUCES HOSPITALIZATION RISK, ENHANCES SOCIAL DISTANCING, AND FACILITATES:**

- Vital sign monitoring for high risk patients
- Hygiene education
- Patient/caregiver education on CDC prevention guidelines
- Facilitation of telehealth visits w/other healthcare providers
- Hospital admission reduction strategies
- Plans of care focused on fall risk, home modification, ADL dysfunction, communication strategies, and more

GERIATRIC HOUSE CALLS™
MEDICARE PART B PROVIDER
PT/OT/SLP EVAL & TREATMENT
NO HOMEBOUND STATUS REQUIRED
NO FACE-TO-FACE REQUIRED
NO HOSPITALIZATION REQUIRED



**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.
FOX REHABILITATES LIVES.**

T 877.407.3422   |   W foxrehab.org

TIM FOX, PT, DPT, GCS-EMERITUS, CCI   |   LIC #4H0A0BT02100   |   2020-0156-DR

22

**Fax #3 (PX003)**

- PX003 -

# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.



### OT AND SLP – MANAGING MEDICATION COMPLIANCY AT HOME

Include interventions surrounding medication management such as use of pharmacy delivery services, adaptive equipment, and compensatory strategies to increase independence and safety, especially in cases where caregiver assistance is now limited or unavailable.

*FOX occupational therapist is treating a patient with medical history of schizophrenia and anxiety who is prescribed multiple medications to manage. Patient's son typically picks medications up monthly from pharmacy and provides set-up via monthly pill box; however, son is currently maintaining social isolation due to possible COVID-19 exposure. FOX occupational therapist establishes goal for medication management and educates patient on pharmacy delivery services, recommends use of blister packs, and trains on compensatory strategy of medication checklists to promote patient independence with medication.*

GERIATRIC HOUSE CALLS™
MEDICARE PART B PROVIDER
PT/OT/SLP EVAL & TREATMENT
NO HOMEBOUND STATUS REQUIRED
NO FACE-TO-FACE REQUIRED
NO HOSPITALIZATION REQUIRED



**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.
FOX REHABILITATES LIVES.**

**T** 877.407.3422  |  **W** foxrehab.org

TIM FOX, PT, DPT, GCS-EMERITUS, CCI  |  LIC. #40DA09T02100  |  2020-0158-D6

23

**Fax #4 (PX 004)**

- PX004 -



# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.

 **COVID-19 ANXIETY – COPING, STRESS, FEAR, AND UNCERTAINTY**

Increase engagement in meaningful activities to improve self-efficacy and reduce fall risk, by establishing patient specific goals.

*FOX physical therapist utilizes Patient Specific Functional Scale to identify areas of function most meaningful to patient. When progress note is due, FOX physical therapist reviews patient goals and provides feedback on patient improvements thus far to promote self-efficacy.*

**GERIATRIC HOUSE CALLS™**
**MEDICARE PART B PROVIDER**
**PT/OT/SLP EVAL & TREATMENT**
**NO HOMEBOUND STATUS REQUIRED**
**NO FACE-TO-FACE REQUIRED**
**NO HOSPITALIZATION REQUIRED**

 **PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.**
**FOX REHABILITATES LIVES.**

**T** 877.407.3422  |  **W** foxrehab.org  |  **F** 800.597.0848

TIM FOX, PT, DPT, GCS-EMERITUS, CCI  |  LIC. #4U0A00702100  |  2020-0198-D6

**Fax #5 (PX005)**

- PX005 -

# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.



### OCCUPATIONAL THERAPY – ADL
### PERFORMANCE AND SAFETY AT HOME

Address activities of daily living such as self-feeding, toileting, and bathing, especially in cases where caregiver assistance is now limited or unavailable.

*FOX occupational therapist did not initially implement bathing goal, as patient would agree only to showering with private home health aide. However, due to potential COVID-19 infection, home health aide is no longer available to assist with showering. FOX occupational therapist has educated on importance of hygiene as related to infection prevention, and patient agrees to participate in bathing interventions. FOX clinician establishes new goal for patient to sponge bathe independently, as this method of bathing is safest for patient to perform without assistance.*

GERIATRIC HOUSE CALLS™
MEDICARE PART B PROVIDER
PT/OT/SLP EVAL & TREATMENT
NO HOMEBOUND STATUS REQUIRED
NO FACE-TO-FACE REQUIRED
NO HOSPITALIZATION REQUIRED



**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.
FOX REHABILITATES LIVES.**

**T** 877.407.3422  |  **W** foxrehab.org  |  **F** 800.597.0848

*TO UNSUBSCRIBE – visit foxrehab.org/fox-opt-out to be removed from future communications like this.*

TIM FOX, PT, DPT, GCS-EMERITUS, CGI  |  LIC. #49DA0P/09100  |  2020-0158-D8

**Fax #6 (PX006)**

- PX006 -

# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.


### SLP – ADDRESSING COGNITION AND SAFETY AT HOME

Use of proven techniques such as spaced retrieval or errorless learning to safely follow schedules, sequence important daily activities, and follow safety measures. Implementation of a memory book/reminders that will assist and guide the patient to follow daily schedules and safely complete and sequence everyday activities. Address safety awareness, problem solving abilities, and ability to organize and plan as appropriate.

*The patient's daughter reports increased concern around the patient's ability to safely complete daily activities, now that she is isolated due to decreased family support. The clinician notes patient's decreased ability to follow through on many everyday activities. A functional goal is created to utilize spaced retrieval for recall of strategies and compensatory methods. A list and memory notebook are implemented and trained with return demonstration by the patient, ensuring safe completion of daily activities.*

GERIATRIC HOUSE CALLS™
MEDICARE PART B PROVIDER
PT/OT/SLP EVAL & TREATMENT
NO HOMEBOUND STATUS REQUIRED
NO FACE-TO-FACE REQUIRED
NO HOSPITALIZATION REQUIRED


**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.
FOX REHABILITATES LIVES.**

**T** 877.407.3422  |  **W** foxrehab.org  |  **F** 800.597.0848

*TO UNSUBSCRIBE – visit foxrehab.org/fax-opt-out to be removed from future communications like this.*

TIM FOX, PT, DPT, GCS, EMERITUS, CCI   IC, #WDA00782100   2020 H76N496

**Fax #7 (PX007)**

- PX007 -

# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.



### OCCUPATIONAL THERAPY – PROPER HYGIENE: CLEAN AND DISINFECT

Provide task and environment modification to promote independence with household management, including routinely disinfecting surfaces with EPA-approved disinfectants. Provide strength, flexibility, endurance, and balance training to improve ability to access all areas of household and disinfect all surfaces as part of household management. Implement interventions specific to laundering clothing and household items, such as bed sheets and towels, to promote cleanliness and hygiene.

*FOX occupational therapist observes that patient with upper extremity weakness has been wearing soiled clothing. Patient reports that caregiver who assisted with laundry is ill and no longer able to assist. FOX occupational therapist develops and trains on home exercise program targeting bilateral bicep strength to improve patient ability to transport laundry basket in order to achieve patient new goal of performing light laundry task with independence.*

**GERIATRIC HOUSE CALLS™**
**MEDICARE PART B PROVIDER**
**PT/OT/SLP EVAL & TREATMENT**
**NO HOMEBOUND STATUS REQUIRED**
**NO FACE-TO-FACE REQUIRED**
**NO HOSPITALIZATION REQUIRED**



**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.**
**FOX REHABILITATES LIVES.**

T 877.407.3422 | W foxrehab.org | F 800.597.0848

*TO UNSUBSCRIBE – visit foxrehab.org/fox-opt-out to be removed from future communications like this.*

TIM FOX, PT, DPT, GCS, EMERITUS, CCI | LIC. #40GA00702180 | 2020-0158 06

**Fax #8 (PX008)**

- PX008 -

# FOX RESPONDS TO COVID-19

## HELPING FLATTEN THE CURVE WITH HOUSE CALLS

FOX's Geriatric House Calls™ therapy model plays an important role in controlling the spread of COVID-19, supporting access to care that reduces hospitalization risk, enhances social distancing, and facilitates education on CDC recommendations to our older adult population.



### SPEECH-LANGUAGE PATHOLOGY – COMMUNICATION IS KEY

Alternative communication strategies, ensuring a communication line to the outside world, ability to engage physician via telemedicine, telephone use, and ability to successfully communicate medical wants and needs. Ability to understand important messages, and the ability to follow directions especially with regard to CDC guidelines and important considerations related to the plan of care.

*During a treatment session, the FOX speech-language pathologist notes the patient having increased difficulty following physician's instructions in addition to instructions from news outlets around CDC guidelines. The speech-language pathologist implements a goal around comprehension of important instructions. Modified written instructions are provided on social distancing and proper hygiene process that are understandable by the patient, given their overall level of functioning with receptive communication.*

GERIATRIC HOUSE CALLS™
MEDICARE PART B PROVIDER
PT/OT/SLP EVAL & TREATMENT
NO HOMEBOUND STATUS REQUIRED
NO FACE-TO-FACE REQUIRED
NO HOSPITALIZATION REQUIRED



**PHYSICAL, OCCUPATIONAL, & SPEECH THERAPY.
FOX REHABILITATES LIVES.**

**T** 877.407.3422   |   **W** foxrehab.org   |   **F** 800.597.0848

*TO UNSUBSCRIBE – visit foxrehab.org/fax-opt-out to be removed from future communications like this.*

TIM FOX, PT, DPT, GCS-EMERITUS, CCI   |   LIC. #40QA00702100   |   2020-0156-D6

FOX0003606